**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **TERRANCE W.**[1], **PLAINTIFF,** | § § § | |
| **V.** | § | **CASE NO. 3:25-CV-1699-B-BK** |
| **COMMISSIONER, SOCIAL SECURITY ADMINISTRATION, DEFENDANT.** | § § § § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b) and *Special Order 3*, Plaintiff's appeal of the denial of his application for Social Security disability benefits and supplemental security income, Doc. 1, is before the undersigned United States magistrate judge for findings and a recommended disposition. For the reasons outlined here, the Commissioner's decision should be **REVERSED**.

## I. BACKGROUND

### A. Procedural History

Plaintiff seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act (the "Act"). Doc. 1.

In October 2021 and May 2022, Plaintiff respectively filed applications for DIB and SSI with the Social Security Administration ("SSA"), alleging a period of disability beginning in

[1] To protect the privacy of plaintiffs in social security cases, the undersigned identifies Plaintiff only by first name and last initial.

May 2021. Doc. 10-1 at 245-258. After his claims were denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Doc. 10-1 at 133-42, 150-59. Ultimately, the ALJ issued a partially favorable decision finding that Plaintiff was not disabled prior to January 13, 2023, but became disabled on, and continued to be disabled after that date. Doc. 10-1 at 34. The Appeals council denied Plaintiff's request for review, Doc. 10-1 at 6-11, and he now appeals to this Court pursuant to 42 U.S.C. § 405(g).

**B. Factual Background**

Plaintiff was 49 years old at the time of his alleged disability onset date. Doc. 10-1 at 245. He has a high school education and past relevant work as a kitchen helper. Doc. 10-1 at 51, 74. Plaintiff's relevant medical history, dating from 2020 through 2024, reveals diagnoses for type 2 diabetes mellitus, hypertension, cervicalgia, neuropathy, sciatica of the right side, and degenerative disc disease of the lumbar and cervical spine.[2] Doc. 10-5 at 83-84; Doc. 10-2 at 43-44; 10-1 at 786-87.

In April 2020, Plaintiff was seen by Dr. James Yarmchuk, M.D., at the Hope Clinic, and complained of numbness in both hands for the last two years, with his right hand worse than left, as well as constant pain in both shoulders for the past six months. Doc. 10-5 at 81. Upon examination, Dr. Yarmchuk noted that Plaintiff had tenderness over his trapezius musculature bilaterally; a stiff gait; and possible "increased muscle tone vs voluntary guarding." Doc. 10-5 at 83. Dr. Yarmchuk further observed that Plaintiff had a past medical history of diabetes mellitus without complications and that Plaintiff had previously had the last two digits of his right hand

[2] Although Plaintiff alleged additional physical impairments related to his upper extremities, his argument on appeal focuses primarily on the ALJ's evaluation of his spinal impairment. *See* Doc. 11 at 1-27. Thus, the Court's review focuses on facts and issues related to his spinal condition.

amputated. Doc. 10-5 at 82-83. Following his assessment, Dr. Yarmchuk continued Plaintiff on his diabetes and hypertension medications and prescribed Plaintiff 800 mg. of Gabapentin three times daily. Doc. 10-5 at 82-84.

On August 9, 2021, Plaintiff was seen by Kevin Jensen, D.O., and complained of chronic, aching pain in his right sciatic area that radiated down to his right calf. Doc. 10-3 at 100-04. Upon examination, Dr. Jensen noted that Plaintiff had normal range of motion in his back but was positive for moderate, radiating pain, both at rest and with movement. Doc. 10-3 at 105. Plaintiff's gait was observed to be steady, and straight leg raises elicited pain in his right leg at 45 degrees. Doc. 10-3 at 105. Dr. Jensen's primary diagnosis included right-sided lumbago with sciatica, and Plaintiff was prescribed Prednisone and Cyclobenzaprine upon discharge. Doc. 10-3 at 106.

Plaintiff's primary care provider, Dr. Providence Uwimana, M.D., also diagnosed Plaintiff with chronic pain disorder and sciatica of the right side in August 2021, following a physical examination. Doc. 10-2 at 43-44. In November 2021, Dr. Uwimana ordered magnetic resonance imaging (MRI) of Plaintiff's lumbar spine. Doc. 10-2 at 126; Doc. 10-1 at 563. The MRI, which was performed on November 16, 2021, showed "[s]hallow lumbar asymmetry" with left curvature at L3-4 and chronic degeneration of multiple discs, endplates, and facet joints. Doc. 10-1 at 565. Specifically, the administering physician observed "[a]dvanced L1-L5 disc and endplate degeneration"; marked L2-L5 thecal sac stenosis and moderate L1-L2 thecal sac stenosis, "due to disc extrusion, profuse epidural fat (lipomatosis), ligamentous thickening, facet joint hypertrophy, and shallow bony anatomy (primary stenosis)"; and marked left L4-5 foraminal stenosis. Doc. 10-1 at 565.

Upon Dr. Uwimana's referral, Plaintiff also had 10 occupational therapy ("OT") sessions at Texas Health between November 2021 and March 2022. Doc. 10-1 at 582, 623-762. At an OT session on December 8, 2021, Plaintiff reported chronic, radiating lower back pain and right lower extremity weakness and pain, which he said caused his leg to buckle and resulted in falls. Doc. 10-1 at 601. Plaintiff also received physical therapy, during which the physical therapist ("PT") noted that Plaintiff was unable to perform tandem or single limb stance, had difficulty advancing his right leg and rising from a chair or mat, and had a poor heel strike. Doc. 10-1 at 602. The PT further observed muscular weakness in Plaintiff's trunk, hips, and right knee and restriction and tenderness of his spine at L4-5 and L5-S1, resulting in decreased lumbar mobility in all directions. Doc. 10-1 at 603-05. Although Plaintiff did not use an assistive device, his gait was documented as "modified independent," and he was assessed as being at moderate risk for falls. Doc. 10-1 at 603-05.

**C. Medical Opinion Evidence**

On July 25, 2022, Plaintiff underwent a Functional Capacity Evaluation performed by Richard Guzman, PT. Doc. 10-1 at 937. PT Guzman determined that Plaintiff was limited to occasional walking, standing, sitting, twisting, and stair climbing (*i.e.*, 1-33% of the day). Doc. 10-1 at 938. He further found that Plaintiff could never perform work activities requiring squatting, kneeling and bending. Doc. 10-1 at 938.

On January 13, 2023, Dr. Robert A. Silverman, M.D., conducted a consultative examination of Plaintiff at the Agency's request. Doc. 10-2 at 141-46. Upon examination, Dr. Silverman noted mild to moderate tenderness of Plaintiff's lumbar spine and lumbar paraspinal musculature and that straight leg testing was positive at 30 degrees bilaterally with back pain as

well as posterior right leg pain. Doc. 10-2 at 144. He further noted that decreased sensation of Plaintiff's lower legs bilaterally from the distal thigh to the ankle. Doc. 10-2 at 145. According to Dr. Silverman, Plaintiff had moderate difficulty getting on and off the examination table, was "unable to heel-walk, toe-walk, or tandem-walk," and walked with a "markedly antalgic gait" without the use of an assistive device. Doc. 10-2 at 145. An x-ray performed concurrently with Dr. Silverman's evaluation showed mild left curvature of the lumbar spine at approximately seven degrees. Doc. 10-2 at 147. The x-ray further revealed "[m]oderate to severe disc changes at L1-L2 and L4-5," with milder degeneration at the remaining levels. Doc. 10-2 at 147. Moderate facet arthropathy was observed at the last three levels. Doc. 10-2 at 147.

Based on these observations, Dr. Silverman's assessment included findings of back pain, sciatica, leg pain, nerve damage, and diabetic neuropathy. Doc. 10-2 at 145. Dr. Silverman noted, however, that due to lack of financial resources, Plaintiff had "not yet had any definitive evaluation with a spine specialist or neurologist." Doc. 10-2 at 145. Nevertheless, he concluded that Plaintiff's prognosis for improvement was "poor." Doc. 10-2 at 145.

**D. Hearing Testimony**

At the 2024 administrative hearing, Plaintiff testified that he experienced constant burning pain from his left hand, up his wrist and shoulders, and down into his right wrist. Doc. 10-1 at 53-54. Plaintiff also testified that he experienced constant neck pain and numbness following his neck fusion surgery in 2024. Doc. 10-1 at 58. He stated that he has difficulty moving his head in any direction, so he must turn his whole body when he needs to move. Doc. 10-1 at 59. He further testified that the pain sometimes ran down through his legs, but that it varies. Doc. 10-1 at 60.

He testified that he could only sit, stand, and walk for ten minutes at a time and that he always used a cane to help him move around. Doc. 10-1 at 60-61. He testified that when he tried to walk without a cane, he would fall or nearly fall. Doc. 10-1 at 61. He further testified that he had trouble reaching in all directions, could not do any lifting, and would drop things due to lack of grip strength. Doc. 10-1 at 64-68. He stated that he does not do any household chores and needs help taking care of his personal hygiene. Doc. 10-1 at 51-52.

Plaintiff further averred that the constant pain makes it hard to concentrate and that his pain medication makes him drowsy and knocks him out. Doc. 10-1 at 54. He also stated that he attends physical therapy, but that it provides only a little relief which does not last after he leaves. Doc. 10-1 at 71. Plaintiff testified that because of these limitations, he would not be able to perform his previous job or a desk job. Doc. 10-1 at 72.

A vocational expert ("VE") testified at the hearing that an individual of Plaintiff's age, education, prior work experience, and with the ALJ's hypothetical functional capacity could not perform Plaintiff's past work but could perform the light exertional jobs of cafeteria attendant, information clerk, and sales attendant. Doc. 10-2 at 74-75. The VE also testified that if such an individual were off task for 15 percent of the day, or would miss three days of work per month, there would be no available work. Doc. 10-2 at 76-77.

**E. The ALJ's Findings**

Following the 2024 administrative hearing, the ALJ issued his Hearing Decision utilizing the five-step sequential evaluation set forth in 20 C.F.R. § 416.920 in determining whether Plaintiff was disabled. Doc. 10-1 at 20-21. At step one, the ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2021, and had not engaged in

substantial gainful activity since May 31, 2021. Doc. 10-1 at 21. As pertinent here, the ALJ found at step two that, as of the alleged onset date of May 2021, Plaintiff had the severe impairments of diabetes mellitus; peripheral neuropathy; and degenerative disc disease of the lumbar and cervical spine. Doc. 10-1 at 21.

At step three, however, the ALJ found that none of Plaintiff's impairments, or any combination thereof, met or "medically equal[ed]" an impairment listed in the applicable regulations. Doc. 10-1 at 26. The ALJ further found that, prior to January 13, 2023, Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with some postural limitations. Doc. 10-1 at 27. However, the ALJ determined that, beginning January 13, 2023, Plaintiff's RFC was limited to sedentary work as defined by the same guidelines. Doc. 10-1 at 31.

At step four, the ALJ concluded that Plaintiff was unable to perform his past relevant work. Doc. 10-1. Relying on the VE's hearing testimony and the Medical-Vocational Guidelines, the ALJ found that Plaintiff had the RFC to perform a significant number of jobs prior to January 13, 2023, but that he could not perform those same jobs after his RFC became limited to sedentary work. Doc. 13-2 at 646-47. Thus, the ALJ concluded that Plaintiff "was not disabled prior to January 13, 2023," but became disabled on, and continued to be disabled after that date. Doc. 10-1 at 34.

## II. Applicable Law

The definition of disability under the Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner utilizes a sequential five-step inquiry: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant's impairments are "severe"; (3) whether the claimant's impairment "meets or equals" one of the listings in the relevant regulations; (4) whether the claimant can still do his past relevant work; and (5) whether the impairment prevents the claimant from doing any other available work. *Webster v. Kijakazi*, 19 F.4th 715, 718 (5th Cir. 2021) (citing 20 C.F.R. § 404.1520(a)(4)). The claimant bears the burden on the first four steps. *Id.* (citation omitted). If the claimant meets his burden, the burden then shifts to the Commissioner to "prove the claimant's employability." *Id.* (citation omitted).

The Court's review "is exceedingly deferential and limited to two inquiries: whether substantial evidence supports the ALJ's decision, and whether the ALJ applied the proper legal standards when evaluating the evidence." *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, [the Supreme] Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (internal citations and quotation marks omitted). The Court cannot "reweigh the evidence or substitute its judgment for the Commissioner's." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). A finding that substantial evidence does not exist "is appropriate only if no credible evidentiary choices or medical findings support the decision." *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016) (cleaned up).

The RFC assessment is based on "all of the relevant evidence in the case record,"

including, but not limited to, medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, and work evaluations. SSR 96-8p, 1996 WL 374184 (July 2, 1996). The ALJ as factfinder has the sole responsibility for weighing the evidence; and the relative weight to be given the evidence is within the ALJ's discretion. *Chambliss v. Massanari*, 269 F.3d 520, 523 (5th Cir. 2001).

## III. Analysis

Plaintiff's sole issue on appeal is whether the ALJ erred in finding his disability onset date was January 13, 2023. Doc. 11 at 3. Specifically, Plaintiff contends that the ALJ mischaracterized and failed to consider relevant evidence showing that his degenerative spine disease caused disabling limitations before that date. Doc. 11 at 18-24. Because those same limitations formed the basis for the ALJ's determination that Plaintiff became limited to sedentary work as to January 2023, Plaintiff argues that the onset determination is unsupported by substantial evidence. Doc. 11 at 26.

### A. The ALJ's Onset Determination is Not Supported by Substantial Evidence.

Social Security Ruling ("SSR") 18-01p outlines the policy and procedures for determining the onset date of disability.[3] *See* SSR 18-01p, 2018 WL 4945639 (S.S.A. Oct. 2, 2018). When the evidence supports a finding that the claimant met the disability definition during the application period, the ALJ must then determine the claimant's established onset date

[3] Although neither party cites SSR 18-01p, the ruling governs the ALJ's onset determination because Plaintiff's claims were pending after its applicable date. *See* SSR 18-01p, 2018 WL 4945639, at *7 ("expec[ing]" federal courts to review SSA decisions using the rulings "in effect" at the time they were issued.).

("EOD"). *Id.* at *2, 5. The EOD is defined as "the earliest date that the claimant meets both the definition of disability and the non-medical requirements for entitlement to benefits[.]" *Id.* at *2.

In determining the onset date for a nontraumatic or "exacerbating" impairment, SSR 18-01p directs the ALJ to review relevant evidence, "taking into account the date the claimant alleged that his or her disability began." *Id.* at *6. The Ruling further directs the ALJ to consider:

> the nature of the claimant's impairment; the severity of the signs, symptoms, and laboratory findings; the [claimant's] longitudinal history and treatment course (or lack thereof); the length of the impairment's exacerbations and remissions, if applicable; and any statement by the claimant about new or worsening signs, symptoms, and laboratory findings.

*Id.* at *6. Unlike its predecessor, SSR 18-01p "expressly provides that the ALJ may 'reasonably infer' the onset date" and leaves the decision to call on a medical advisor to the ALJ's discretion. *Braley v. Kijakazi*, No. 3:20-cv-3207, 2022 WL 4280918, at *13-14 (N.D. Tex. Aug. 31, 2022) (Ramirez, J.), *rep. & rec. adopted*, 2022 WL 4280652 (N.D. Tex. Sept. 15, 2022) (citation omitted). However, the ALJ's authority to infer an onset date does not dispense with the requirement that the determination "be supported by the medical and other evidence and be consistent with the nature of the impairment(s)." SSR 18-01p, 2018 WL 4945639, at *5. Thus, where the selected onset date is arbitrary and unsupported by an informed inference, it cannot be sustained. *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993) (applying SSR 83-20); *see also Philips v. Comm'r of Soc. Sec.*, No. 19-cv-1633, 2021 WL 2550387, at *12 (E.D.N.Y. June 22, 2021) (Mauskopf) (noting that, under SSR 18-01p, "[a]n arbitrary onset date selection will not be accepted by a reviewing court") (internal quotation marks and citation omitted).

As stated *supra*, the ALJ selected January 13, 2023, as Plaintiff's onset date based on Dr. Silverman's consultative examination conducted on that date. *See* Doc. 10-1 at 32. In support,

the ALJ pointed to Dr. Silverman's observations that Plaintiff had a "markedly antalgic gait" without the use of an assistive device and was "unable to heel-walk, toe-walk, or tandem-walk." Doc. 10-1 at 24 (citing Doc. 10-2 at 145). The ALJ also highlighted that mild to moderate tenderness of Plaintiff's lumbar spine was observed, straight leg testing was positive at 30 degrees bilaterally with back pain as well as right leg pain, and that x-rays of Plaintiff's lumbar spine were "positive for moderate to severe degenerative disc changes at the L1-L2 and L4-5 levels." Doc. 10-1 at 23-24, 31 (citing Doc. 10-2 at 144, 147). The ALJ further noted that, "[p]roviders continued to note evidence of an antalgic gait" after January 2023, which the ALJ found suggested worsening neuropathy. Doc. 10-1 at 32 (citing Doc. 10-4 at 82, 150-51). Finally, the ALJ cited a March 2023 MRI of Plaintiff's cervical spine that revealed "severe stenosis," and ultimately resulted in Plaintiff undergoing fusion surgery in 2024. Doc. 10-1 at 32. The ALJ concluded that "[o]verall, these findings support and are consistent with" reducing Plaintiff's RFC to sedentary work as of January 13, 2023. Doc. 10-1 at 32.

In challenging the ALJ's conclusion, Plaintiff principally relies on the November 2021 MRI of his lumbar spine. Doc. 11 at 20. Plaintiff contends that, consistent with Dr. Silverman's January 2023 findings, the 2021 MRI showed chronic and advanced degeneration of his lumbar spine, demonstrating that the limitations supporting the reduction of his RFC existed well before the selected onset date. Doc. 11 at 20. Defendant responds that the ALJ considered the entire medical record, including the 2021 MRI, but reasonably concluded that the evidence did not establish that Plaintiff's limitations were disabling before January 2023. Doc. 12 at 3.

Although the ALJ acknowledged that the 2021 MRI "also showed evidence of advanced disease," he nevertheless found that the objective medical evidence did not support Plaintiff's

alleged onset date for two reasons. Doc. 10-1 at 26-29. First, he noted that physical examinations before January 2023 "generally revealed no evidence of gait abnormalities" or use of an assistive device, with Plaintiff consistently demonstrating intact motor strength in his lower extremities. Doc. 10-1 at 26, 32. Second, he observed that Plaintiff "generally received conservative treatment" for complaints of neck and back pain prior to the established onset date. Doc. 10-1 at 29, 31.

Plaintiff argues that neither rationale provides a substantial basis for rejecting his alleged onset date and that the ALJ's selection of January 13, 2023, as the EOD is otherwise unsupported by substantial evidence. Upon review of the record, the Court agrees.

In support of his onset determination, the ALJ cited a string of medical records purportedly showing that Plaintiff "demonstrate[ed] a normal gait with full strength to the lower extremities" before January 2023. Doc. 10-1 at 32 (citing Exhibit 1F/46-48; 3[F]/9; 6F/15, 17-18, 22, 33, 39, 45, 48; 15F/3-4; 16F/5, 15). As Plaintiff points out, however, a review of the referenced medical records reveals that the majority contain no evidence related to Plaintiff's degenerative spine condition or the functioning of his lower extremities. For example, Exhibits 1F/46-48 and 16F/5, 15, as referenced by the ALJ, concern treatment for a chemical burn to Plaintiff's forearm, and contain no findings regarding his spine, gait, or lower extremities. *See* Doc. 10-1 at 488-98; Doc. 10-3 at 144-45. Likewise, pages 22, 33, 39, 45, and 48 of Exhibit 6F detail Plaintiff's visits to HHM Health between July 2021 and April 2022 for management of his diabetes and hypertension. *See* Doc. 10-2 at 17-20, 28-31, 35-37, 43-46. Although these records note "normal motor strength in [both] upper and lower extremities," they do not show that

Plaintiff's spine, gait, or mobility was specifically examined during those visits. Doc. 10-2 at 17-20, 28-31, 35-37, 43-46.

To be sure, some of the cited records do provide some support for the ALJ's conclusion. Specifically, pages 15-18 of exhibit 6F detail Plaintiff's visits to HHM Health in July and August 2022 for "head and back pain," during which Plaintiff was observed to have a normal gait. Doc. 10-2 at 10-16. Plaintiff's gait was also described as within "normal limits" during his January 2022 appointment at Lone Star Neurology, although the appointment appears to have primarily concerned his chemical burn. *See* Doc. 10-3 at 131-34 (Exhibit 15F/3-4). But to the extent that these isolated records support a conclusion that Plaintiff had no gait abnormalities before 2023, other record evidence supports a contrary conclusion.

For example, Plaintiff points to the December 8, 2021 occupational therapy evaluation during which the physical therapist observed "muscular weakness" of Plaintiff's trunk, hips, and right knee, and "decreased lumbar mobility in all directions" with restriction and tenderness at L4-5 and L5-S1. Doc. 10-1 at 603-05. The PT further noted that Plaintiff moved slowly and with caution, had difficulty rising from a chair, exhibited a poor heel strike and "gait deviations," and was "unable to perform single leg or tandem stance without max sway." Doc. 10-1 at 602-05. Based on these observations, the PT listed walking, standing on right leg, bending, and lifting as among Plaintiff's functional limitations. Doc. 10-1 at 603-05.

Notably, although the ALJ referenced the December 2021 physical therapy examination at step two of his decision, he failed to explain what weight, if any, he afforded the examination

or otherwise address its significance in determining Plaintiff's EOD.[4] *See* Doc. 10-1 at 29-32. Nor did the ALJ address subsequent physical therapy records showing that Plaintiff continued to exhibit limited functional mobility and weakness in his lower extremities into 2022. *See, e.g.*, Doc. 10-1 at 737 (January 10, 2022 record listing "[i]mpaired functional mobility, balance, gait, and endurance" as well as back pain in the lumbar region and weakness of both hips and trunk musculature among visit diagnoses); Doc. 10-1 at 750 (January 13, 2022 record noting the same diagnoses).

Instead, in justifying the EOD, the ALJ repeatedly stated only that "physical exams prior to the established onset sate did not demonstrate evidence of gait abnormalities without the use of an assistive device[.]" Doc. 10-1 at 26, 29-30. But in making this finding, the ALJ overlooked medical evidence documenting gait abnormalities and other lower-extremity limitations as early as December 2021. Thus, the mostly inapposite treatment notes cited by the ALJ do not support his selection of January 2023 as the established onset date. *See, e.g., Franklin v. Bisignano*, No. 2:23-cv-2442, 2025 WL 1604085, at *7 (D.N.J. June 6, 2025) (King, J.) (Holding that the EOD lacked substantial support where the ALJ relied on treatment notes from that date showing glaucoma in both eyes, despite "similar medical evidence reflecting that [p]laintiff had glaucoma in both eyes as early as 2013 or 2014[.]").

The ALJ's reliance on Plaintiff's receipt of "generally conservative treatment[s]" prior to 2023 likewise does not support the selected onset date. Although the ALJ refers to records

[4] While the ALJ vaguely references a "December 2021" physical therapy appointment, his citations instead correspond to a July 2021 follow-up appointment for Plaintiff's burn injury rather than to either of the physical therapy records dated that month. Doc. 10-1 at 22 (citing Doc. 10-1 at 487-90 [Exhibit 1F/45-48]).

showing that Plaintiff received injections, physical therapy, muscle relaxants, and pain medications for his neck and back pain throughout 2021, the ALJ fails to identify any meaningful change in Plaintiff's treatment as of January 13, 2023. Doc. 10-1 at 29. On the contrary, Dr. Silverman's report stated that, as of that date, Plaintiff remained on Gabapentin for pain management and had not received a steroid injection for several years. Doc. 10-2 at 145-46. As the ALJ acknowledged, Plaintiff continued to receive "conservative treatment in the form of chiropractic treatments and physical therapy for his cervical symptoms" well into 2023. Doc. 10-1 at 25 (citing Doc. 10-4 at 100 [Ex. 21F/7] (August 2023 assessment of Plaintiff's cervical spine, recommending steroid injection and continued physical therapy)). While the ALJ cited Plaintiff's cervical fusion surgery as evidence of worsening disease in his cervical spine, that surgery did not occur until March 20, 2024, more than one year after Dr. Silverman's examination and the selected onset date. *See* Doc. 10-5 at 60-62. Accordingly, the ALJ's reliance on Plaintiff's "conservative treatment history" does no support his selection of January 13, 2023, as the established onset date.

Similarly, to the extent the ALJ's based his conclusion on the fact that Plaintiff did not use an assistive device, the ALJ identified no evidence—and the Court is aware of none—showing that Plaintiff's use of, or need for an assistive device changed on or around the selected onset date. *See* Doc. 10-1 at 32. Consistent with medical records pre-dating January 2023, Dr. Silverman observed that Plaintiff was "not using an assistive device for ambulation" on the date of his examination. Doc. 10-2 at 145. As explained above, Dr. Silverman's remaining observations relating to Plaintiff's mobility closely resemble observations made by Plaintiff's physical therapist in 2021. *Compare* Doc. 10-2 at 145 (noting that Plaintiff "walk[ed] with a

markedly antalgic gait," had moderate difficulty getting on and off the examination table, and was unable to heel-walk, toe-walk, or tandem-walk), *with*, Doc. 10-1 at 601-05 (observing "gait deviations," poor heel strike, an inability to perform a single leg or tandem stance, and difficulty rising from a chair or mat). Although other records are inconsistent as to Plaintiff's ability to ambulate without support prior to the selected onset date, he did not report using an assistive device until August 2023. *See* Doc. 10-4 at 149. Thus, Plaintiff's use of an assistive device does not support the finding that his symptoms became disabling more than six months earlier either. And this further suggests the arbitrariness of the ALJ's EOD.

In response to Plaintiff's assertion of error, Defendant merely recites the evidence considered by the ALJ and maintains that the ALJ was not required to perform an exhaustive discussion of each medical finding in weighing the evidence. Doc. 12 at 3, 8. But while an ALJ need not engage in an "exhaustive point-by-point discussion" of the entire record, the ALJ must nevertheless discuss the evidence offered in support of the claim for disability and explain why, notwithstanding that evidence, he found that the claimant was not disabled at that step. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).

Here, he did not do so. As explained above, the ALJ provided no legitimate medical basis for rejecting Plaintiff's alleged onset date. Instead, he merely adopted the date of Dr. Silverman's consultative evaluation and stated, without further explanation, that this evaluation, together with a number of examinations conducted *after* January 13, 2023, "support and are consistent with a further reduction to a range of sedentary work" as of that date. *See* Doc. 10-1 at 32. But none of these evaluations offered an opinion as to when, and to what extent, Plaintiff's functional capacity deteriorated to that level and Dr. Silverman's report itself noted

that Plaintiff "had not yet had any definitive evaluation with a spine specialist or neurologist." Doc. 10-2 at 145.

As the Fifth Circuit has explained "[t]he critical date is the date of *onset* of disability, *not* the date of diagnosis." *Spellman*, 1 F.3d at 364 (cleaned up) (emphasis in original). Indeed, courts have found that an ALJ's selection of the date of a consultative examination as the onset date is precisely the sort of arbitrary determination that cannot be sustained on review. *See Busch v. Kijakazi,* No 1:21-cv-01002, 2021 WL 5771228, at *4 (D.S.D. Dec. 6, 2021) (Kornmann, J.) (holding that the ALJ "cannot blindly place the onset date on the day of a medical exam, a fixed number of weeks or months before a certain diagnosis, or based upon the filing of the claim."); *Philips v. Comm'r of Soc. Sec.*, No. 19-cv-1633, 2021 WL 2550387, at *12 (E.D.N.Y. June 22, 2021) (Mauskopf, J.) (concluding that the ALJ's selection of an onset date corresponding to an MRI finding was the sort of "arbitrary onset date selection ... not [to] be accepted by a reviewing court.").

Accordingly, because the ALJ arbitrarily selected January 13, 2023, based on the date of Plaintiff's examination rather than a reasonable inference from the medical record as a whole, his onset determination is not supported by substantial evidence.

**B. The ALJ's Error Was Not Harmless.**

Defendant does not argue, and the Court does not find, that the ALJ's error in this respect is harmless. Because the onset date affects the period for which the individual is eligible for benefits, the Fifth Circuit has recognized that "it is essential that an onset date be correctly established and supported by the evidence." *Spellman*, 1 F.3d at 361. As explained above, the ALJ failed to properly consider medical evidence supporting Plaintiff's alleged onset date.

Although proper consideration of the full medical record may not alter the ALJ's onset determination, the Court will not speculate as to the outcome where the record, if properly developed, could support a different onset date. Because proper consideration of the record could lead the ALJ to infer a different onset date, the ALJ's failure to support his determination with medical evidence requires remand. *See, e.g., Martha V. v. Kijakazi*, No. 4:21-cv-3267, 2023 WL 2590956, at * (S.D. Tex. Mar. 21, 2023) (Palermo, J.) (remanding where the ALJ failed to apply SSR 18-01p in determining the claimant's disability onset date and there was a realistic possibility that doing so would lead to a different conclusion); *Busch*, 2021 WL 5771228, at *6 (finding remand was proper where the ALJ failed to consider "the *full* administrative record" in determining the disability onset date).

## IV. CONCLUSION

The Court finds that the ALJ's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision should be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

**SO RECOMMENDED** on September 9, 2026.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation will be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). An objection must identify the finding or recommendation to which objection is made, state the basis for the objection, and indicate where in the magistrate judge's report and recommendation the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).